UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JONATHAN LANCASTER,

        Plaintiff,                  CASE NO. 16-14446
                                          HON. DENISE PAGE HOOD

v.

COMCAST COMMUNICATIONS
MANAGEMENT LLC,

        Defendant.
_____/

## ORDER GRANTING DEFENDANT'S MOTION TO COMPEL ARBITRATION AND TO STAY JUDICIAL PROCEEDINGS [#8] AND ADMINISTRATIVELY CLOSING CASE

**I.    BACKGROUND**

On December 22, 2016, Plaintiff Jonathan Lancaster ("Lancaster") filed a Complaint against Defendant Comcast Communications Management LLC ("Comcast") alleging Violation of Title VII of the Civil Rights Act of 1964 and 1991, as amended (Count I) and Violation of Michigan's Elliott-Larsen Civil Rights Act (Count II). On March 6, 2017, Comcast filed the instant Motion to Compel Arbitration and to Stay or Dismiss Judicial Proceedings. (Doc # 8) On April 5, 2017, Lancaster filed a Response. (Doc # 11) On April 19, 2017, Comcast filed a Reply. (Doc # 13) The Court held a motion hearing on May 17, 2017.

1

This case arises out of the employment and subsequent termination of Lancaster by Comcast. Lancaster began his employment with Comcast on June 9, 2003 as a Communications Technician. In October 2008, Lancaster was promoted to Supervisor of Installation and Maintenance. In November 2013, Lancaster became Information Technology ("IT") Manager within Comcast's IT department. Lancaster is African American, and he alleges that Comcast fostered a racially hostile work environment in which supervisors and workers routinely made racists comments with no consequence. Lancaster complained to the appropriate Human Resources ("HR") personnel, and he was interviewed by an HR Manager (the Complaint does not specify when).

In March 2015, Lancaster was advised that one of his supervisees had filed allegations that Lancaster and another supervisor had been unfair in the supervisee's annual review. The Complaint alleges that, in addition to interviewing this supervisee, HR actively solicited other complaints regarding Lancaster's management style in an effort to build a case against him. Subsequently, Lancaster was accused of misconduct and of creating a hostile work environment, and he was placed on administrative leave. On April 10, 2015, Lancaster filed an internal complaint alleging that he was being targeted because he is African American. On April 29, 2015, Lancaster was terminated because he had allegedly created a hostile work environment and was not trusted by his

2

employees. That same day, Lancaster's supervisor and long-time employee, Richard Kroger, who is also African American, was also terminated by the same individuals who terminated Lancaster. Lancaster and Kroger were allegedly the only African American managers within Comcast's IT department. Both positions were reassigned to white employees.

Lancaster alleges that he was terminated due to his race and in retaliation for his complaints of race discrimination and of a racially hostile work environment in violation of the Civil Rights Act of 1964 and 1991, as amended, and Michigan's Elliott-Larsen Civil Rights Act. In lieu of an answer, Comcast filed the instant Motion to Compel Arbitration.

According to a Declaration of Lynn Collins ("Collins"), Vice President of Comcast Solutions, in October 2012, Comcast rolled out an alternative dispute resolution program called Comcast Solutions that included mandatory arbitration of employment-related disputes. (Doc # 8-2, Pg ID 54, 65-66, 72) The Comcast Solutions program description was posted on the TeamComcast company intranet site in October 2012 and was accessible to Lancaster during his employment. *Id.* at 54. Comcast Solutions was specifically introduced to the Heartland Region, which includes Michigan employees, in July 2013. *Id.* at 55. The TeamComcast site was updated to specifically identify a rollout to the Heartland Region. Collins presented two webinars to management and supervisors in the Heartland Region.

Comcast also mailed a Comcast Solutions brochure to employees' home addresses in the Heartland Region. *Id.*

Comcast Solutions was rolled out as an opt-out program. *Id.* at 56. If an employee did not want to participate, he was required to opt out by submitting a designated form for that purpose by the August 28, 2013 deadline. *Id.* at 91. Comcast's records indicate, and Lancaster does not dispute, that Lancaster did not opt out of the program. *Id.* at 57.

Lancaster asserts in his Response, without including a sworn statement or any other supporting documentation, that he had no knowledge of Comcast Solutions program or the need to opt out and that he never received the program materials. According to Collins, Lancaster attended a webinar presented by Collins to managers and supervisors on July 16, 2013. The attendance sheet from the webinar shows, and Lancaster does not dispute, that Lancaster participated for the duration of the webinar. (Doc # 8-2, Pg ID 100) According to Collins, the Comcast Solutions program was discussed in detail during the webinar, including the Comcast Solutions Frequently Asked Questions (Doc # 8-2, Pg ID 71-76), the Program Guide for Comcast Solutions Early Dispute Resolution Program (Doc # 8-2, Pg ID 78-85), the Comcast Solutions Initial Filing Form (Doc # 8-2, Pg ID 87-89), the Comcast Solutions Opt-Out Request Form (Doc # 8-2, Pg ID 91), and the Comcast Solutions Brochure (Doc # 8-2, Pg ID 60-67). (Doc # 8-2, Pg ID 58)

4

The aforementioned program materials specify that claims of discrimination based on race are covered claims under the Comcast Solutions program. *Id.* at 62, 66, 73. According to Lancaster, he did not receive the program materials at the webinar, and he does not recall the webinar.

Comcast also tracked the brochure mailings to employees' home addresses, and Comcast records indicate that the letter and brochure mailed to Lancaster's address was not returned as undeliverable. *Id.* at 57, 69. This brochure included information about the opt-out requirement. *Id.* at 60. It also included a bolded "important note," stating as follows.

> **If you agree to participate in the program, both you and the company waive the right to bring a civil action or have a jury trial for any covered legal claims. You also waive the right to bring or participate in a class action or collective or representative action on covered claims. <u>All</u> covered claims will be handled through the above three-step Comcast Solutions process; both you and the company will be bound by the final decision of the arbitrator.**

*Id.* at 65 (emphasis in original). The brochure stated that claims of discrimination based on race were covered claims under Comcast Solutions. *Id.* at 62. The brochure urged employees to read the Program Guide, Frequently Asked Questions, and other materials, and listed how employees could access these materials through the TeamComcast site or through local HR representatives, etc. *Id.* at 65, 67.

Collins also sent an e-mail to Lancaster about Comcast Solutions on August 22, 2013. *Id.* at 93-95. Comcast has a record of employees who deleted this e-mail without opening it or who were out of the office when this e-mail was sent, but Lancaster's name does not appear on either list, indicating that he opened this e-mail. *Id.* The e-mail asked employees to review the program materials and consider whether they would like to participate by the opt-out deadline. It included a link to the program materials posted on the TeamComcast site. The e-mail further stated as follows.

> Please note that if you wish to participate in the program, you do not have to do anything further. However, if you do not wish to participate in the program, you will need to complete and return an "opt out" form (available at the link above) to this email address by no later than August 28, 2013, if you have not already done so.

*Id.* at 95. Lancaster does not dispute that he received this e-mail or that he had access to the TeamComcast intranet site where the Comcast Solutions materials were posted.

## II. ANALYSIS

### A. Standard of Review

The alleged arbitration agreement at issue here falls within the scope of the Federal Arbitration Act ("FAA"). *See E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 299 (2002). Section 2 of the FAA provides that written arbitration agreements involving commerce "shall be valid, irrevocable, and enforceable, save

upon such grounds as exist at law or in equity for the revocation of any contract."

9 U.S.C. § 2. Section 3 provides that

> [i]f any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had . . . .

9 U.S.C. § 3. Section 4 allows a party aggrieved by another party's refusal to arbitrate to petition the district court to compel arbitration in accordance with the parties' arbitration agreement. *See* 9 U.S.C. § 4.

Pursuant to the FAA, a claim is arbitrable if: (1) there is a valid agreement to arbitrate; (2) the claim falls within the scope of the arbitration agreement; and (3) if the claim is statutory, it must not be one which the legislative body intended to be precluded from arbitration. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626-28 (1985).

### B. Whether There is a Valid Agreement to Arbitrate

Lancaster argues that there is no valid agreement to arbitrate because he had no notice of Comcast's arbitration offer. Lancaster argues that because he had no knowledge of Comcast Solutions, he could not agree to or accept the arbitration offer.

Comcast argues that Lancaster had adequate notice of the arbitration offer such that continued employment and failure to opt out of the program was sufficient to act as acceptance of the offer.

Whether a valid agreement to arbitrate exists is determined under general principles of state contract law. *See Tillman v. Macy's, Inc.*, 735 F.3d 453, 456 (6th Cir. 2013); *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987). Under Michigan law, "[b]efore a contract can be completed, there must be an offer and acceptance." *Pakideh v. Franklin Commercial Mortg. Grp., Inc.*, 213 Mich. App. 636, 640 (1995). "An offer is defined as the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Kloian v. Domino's Pizza L.L.C.*, 273 Mich. App. 449, 453 (2006) (internal quotation marks omitted). "An acceptance sufficient to create a contract arises where the individual to whom an offer is extended manifests an intent to be bound by the offer, and all legal consequences flowing from the offer, through voluntarily undertaking some unequivocal act sufficient for that purpose." *Id.* at 453-54 (internal quotation marks and alterations omitted). "The party seeking to enforce a contract has the burden of showing that it exists." *Hergenreder v. Bickford Senior Living Grp., LLC*, 656 F.3d 411, 417 (6th Cir. 2011) (citing *Kamalnath v. Mercy Mem'l Hosp. Corp.*, 194 Mich. App. 543, 549 (1992)).

The Court finds that Comcast effectively communicated to Lancaster an offer to enter into a binding arbitration agreement and to waive his right to a jury trial. First, Lancaster does not dispute that he attended a Comcast Solutions webinar for managers and supervisors in July 2013. He claims that he does not recall the content of the webinar; however, he presents no evidence to rebut Collins's testimony that the Comcast Solutions program and program materials were discussed in detail during the webinar. While Lancaster claims that he never received a printed copy of the program materials through the webinar, Collins's testimony indicates that the webinar included instructions on how to electronically access all of the program materials posted on the TeamComcast site. Lancaster does not dispute that these instructions were provided, or that he had access to the electronic program materials.

Second, Comcast mailed a Comcast Solutions program brochure to Lancaster's home address. Collins's testimony indicates that the brochure mailed to Lancaster's home address was not returned as undeliverable. Lancaster claims that he never received this mailing; however, the Court should proceed under the assumption that Lancaster received the materials sent to him, "because properly addressed and posted mail is presumed to have been delivered and received by the person to whom it was addressed, *Hagner v. United States*, 285 U.S. 427, 430 (1932), and the operative question hinges on an objective manifestation of intent to

enter into an agreement." *Tillman*, 735 F.3d at 457 n.1 (some citations omitted); *see* Doc # 8-2, Pg ID 69.

Third, Comcast submitted documentation showing that Lancaster received and opened an e-mail that asked him to review the Comcast Solutions program materials, reminded him of the requirement to opt out by the deadline, and provided a link to all of the program materials (that had already been discussed at the webinar that he attended as a manager and supervisor, and which included the brochure that had been mailed to his home). Lancaster does not dispute that he opened this e-mail or that he had access to the TeamComcast intranet site where the Comcast Solutions materials were posted.

The Court finds that Comcast provided Lancaster with information through the webinar he attended; through the brochure that was mailed to his home address that directed him to review the program materials available through the TeamComcast site or an HR representative; through the e-mail he opened that directed him to review the program materials available through the link included in the e-mail; and through all of the program materials posted on TeamComcast, an intranet site to which he had access. Taken together, this information would have alerted Lancaster: that arbitration was an optional part of the Comcast Solutions program (Doc # 8-2, Pg ID 64, 71, 83); that arbitration was a final and binding alternative to a civil lawsuit (*Id.* at 63-66, 72, 74); that agreeing to arbitration

meant waiving the right to file a civil action in court and the right to a jury trial (*Id.* at 65, 66, 84); that he was eligible to opt out of participation in the program (*Id.* at 60, 64-65, 78, 91, 95); and that the process for opting out was to fill out the Comcast Solutions Opt-Out Request Form, available through the TeamComcast site or an HR representative, by the deadline (*Id.* at 60, 65-67, 76, 95). Under these circumstances, the Court finds that this case is analogous to *Tillman*, a factually similar case in which the Sixth Circuit found that such notice effectively communicated an offer to enter into a binding arbitration agreement and to waive the right to a jury trial. *See Tillman*, 735 F.3d at 456-60 (finding that the plaintiff could not claim to be unaware of the opt-out arbitration program where the policy was posted electronically, was in fact mailed to her, and was discussed at a meeting that the plaintiff attended).[1] The Court concludes that Comcast

---

[1] Lancaster relies heavily on *Hergenreder v. Bickford Senior Living Grp., LLC*, 656 F.3d 411, 417 (6th Cir. 2011). However, in *Tillman*, the Sixth Circuit distinguished *Hergenreder* in several respects, illustrating why *Hergenreder* is not analogous to either *Tillman* or the case at bar:

> The plaintiff in [*Hergenreder*] was said by her employer to have assented to arbitration based only on a dispute-resolution policy that was not provided by the employer or made available save for a vague reference in an employee handbook that did not explicitly mention arbitration. *Hergenreder*, 656 F.3d at 414-16. We held that the handbook's direction to refer to the company's dispute-resolution procedure for "details" about the procedure did not constitute an offer. Hergenreder's general knowledge that a dispute-resolution procedure existed did not mean that her employer communicated an offer in the absence of her knowledge of either the arbitration language or her employer's desire to create an agreement through the dispute-resolution procedure. *Id.* . . . In *Hergenreder*, . . . we suggested that if the dispute-resolution procedure had been "posted" in a place—either physical or electronic—available to Hergenreder, if there were meetings at which Hergenreder was notified of the policies, or if Hergenreder was

objectively manifested its intent to enter into an arbitration agreement with Lancaster.

Next, the Court finds that Lancaster's conduct following the communication of the offer objectively suggests that he accepted the arbitration agreement by continuing his employment without returning an opt-out form. As the Sixth Circuit explained in *Tillman*, "[t]his performance mirrors that called for in the offer, and the manifestation of mutual assent may be made wholly or partly by acts or conduct." *Tillman*, 735 F.3d at 460 (internal quotations omitted) (citing *Ludowici-Celadon Co. v. McKinley*, 307 Mich. 149 (1943)). The court further noted that "[b]ecause the information conveyed in the Plan Document and brochure was part of a valid offer, and because Tillman accepted that offer by continuing her employment . . . without returning an opt-out form, it follows that Tillman knowingly and voluntarily assented to all its terms, including th[e] clearly stated waiver of the right to trial by jury." *Id.* at 461. The same reasoning applies here where the Comcast Solutions brochure (discussed at the webinar Lancaster attended, mailed to Lancaster's home address, available through the link in the e-mail that Lancaster opened, and posted on the TeamComcast intranet site that Lancaster had access to) clearly stated that agreeing to arbitration and participating

---

aware of the dispute-resolution procedure at all, the result may have been different. *Id.* at 418-19.

*Tillman*, 735 F.3d at 459 (internal quotations and alterations omitted).

in the Comcast Solutions program meant waiving the right to file a civil action in court and the right to a jury trial.

The Court concludes that there exists a valid agreement to arbitrate between Comcast and Lancaster because Comcast effectively communicated to Lancaster an offer to enter into a binding arbitration agreement and to waive his right to a jury trial, and because Lancaster accepted that offer and knowingly and voluntarily assented to all its terms, including the waiver of the right to trial by jury.

### C. Whether the Arbitration Agreement Provides for Effective Vindication Statutory Civil Rights Claims

Lancaster's last argument is that, even if he received sufficient notice of Comcast's offer and accepted that offer, the arbitration agreement is not enforceable because it does not provide for an effective vindication of his statutory civil rights. Lancaster specifically takes issue with the arbitration agreement's limits on discovery and hearing length.

Comcast maintains that Lancaster's argument fails because, under the terms of the Comcast Solutions program, the arbitrator has discretion to expand discovery and hearing limits as needed.

Limitations on discovery and hearing length do not necessarily prevent plaintiffs from effectively vindicating discrimination claims. *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 31 (1991) (noting that it is unlikely that age discrimination claims require more extensive discovery than other claims

that the court has found to be arbitrable, such as RICO and antitrust claims). The Supreme Court observed in *Gilmer*:

> Moreover, there has been no showing in this case that the NYSE discovery provisions, which allow for document production, information requests, depositions, and subpoenas will prove insufficient to allow ADEA claimants such as Gilmer a fair opportunity to present their claims. Although those procedures might not be as extensive as in the federal courts, by agreeing to arbitrate, a party trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration. Indeed, an important counterweight to the reduced discovery in NYSE arbitration is that arbitrators are not bound by the rules of evidence.

*Id.* "Courts routinely find that reasonable procedural limits are valid in arbitration proceedings, particularly when employees can request additional discovery as needed." *Garcia v. Comcast Cable Commc'ns Mgmt. LLC*, No. 5:16-CV-02975-EJD, 2017 WL 1210044, at *3 (N.D. Cal. Mar. 31, 2017).

The arbitration agreement at issue here provides as follows.

> Discovery will be conducted over a 90-day period, with each party permitted to take up to four depositions (or a total of 32 hours of deposition time), including any expert depositions, and to propound up to 20 interrogatories and 15 document requests to the other party. . . . Any discovery disputes (as well as any requests to take additional discovery outside these guidelines) will be submitted to and resolved by the Arbitrator. Upon completion of discovery, an arbitration hearing will be scheduled to last no more than two 8-hour days (although either party may submit a request to the Arbitrator for a longer hearing to be scheduled, if the party is able to demonstrate that additional time is necessitated by the complexity of the case).

(Doc # 8-2, Pg Id 83)

Lancaster notes that the numbers of depositions, interrogatories, and document requests allowed under the arbitration agreement are below the numbers allowed under the Federal Rules of Civil Procedure. Lancaster further notes that there is no limit on the length of the hearing under the federal rules. Lancaster argues that this is a complex Title VII case in which he will have to prove a pattern and practice of racial discrimination in the workplace. He claims there may be as many as ten witnesses in this case that will need to be deposed and testify at the arbitration hearing. He further claims that extensive document discovery will be needed, including personnel files of witnesses and key actors, e-mails, text messages, and other electronically-stored information.

Lancaster ignores the portion of the arbitration agreement that allows either party to submit a request to the arbitrator to take additional discovery and/or for a longer hearing to be scheduled due to the complexity of a case. The Court finds that the discovery limits are valid and do not render the arbitration agreement unenforceable, particularly where the mutually-selected, neutral arbitrator will have discretion to provide for additional discovery and/or hearing time. *See* Doc # 8-2, Pg ID 83.

**D. Whether To Compel Arbitration and Stay Judicial Proceedings**

The FAA applies to the arbitration agreement at issue here because it affects commerce, a point that Lancaster does not dispute. *See Circuit City Stores, Inc. v.*

*Adams*, 532 U.S. 105, 113-14, 119, 123-24 (2001). Further, the dispute in this case is arbitrable because: (1) there is a valid and enforceable agreement to arbitrate, as set forth above; (2) Lancaster's race discrimination claims fall within the substantive scope of the arbitration agreement, *see* Doc # 8-2, Pg ID 62, 66, 73 (specifically stating that Comcast Solutions covers claims of employment discrimination based on race), a point that Lancaster does not dispute; and (3) Lancaster's statutory claims are not ones which the legislative bodies intended to be precluded from arbitration, *see Circuit City*, 532 U.S. at 123-24; *Gilmer*, 500 U.S. at 29-30, a point that Lancaster does not dispute. Lastly, it is undisputed that Lancaster has unequivocally refused to arbitrate. For these reasons, the Court compels arbitration and stays judicial proceedings in this case. *See Mitsubishi*, 473 U.S. at 626-28; 9 U.S.C. §§ 3, 4.

### III. CONCLUSION

For the reasons set forth above,

IT IS HEREBY ORDERED that Defendant's Motion to Compel Arbitration and to Stay or Dismiss Judicial Proceedings (Doc # 8) is GRANTED.

IT IS FURTHER ORDERED that Plaintiff Jonathan Lancaster shall arbitrate in accordance with the parties' arbitration agreement.

IT IS FURTHER ORDERED that the judicial proceedings in this matter are STAYED until such arbitration has been completed.

IT IS FUTHER ORDERED that this case is ADMINISTRATIVELY CLOSED.


Dated: August 23, 2017	s/Denise Page Hood
	Chief, U.S. District Court

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 23, 2017, by electronic and/or ordinary mail.


s/Julie Owens
Acting in the absence of LaShawn R. Saulsberry
Case Manager